# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1344V**

| | |
|---|---|
| SEAN BOOKER,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: August 11, 2026 |

*Christopher E. Hultquist, Law Office of Christopher E. Hultquist, Esq., Providence, RI, for Petitioner.*

*Tyler King, U.S. Department of Justice, Washington, DC, for Respondent.*

**FACT RULING REGARDING SEVERITY**[1]

On August 28, 2024, Sean Booker filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine received on May 30, 2023, he suffered from a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table. Pet., ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Following medical review of the claim, Respondent submitted his Rule 4(c) Report, arguing that injury severity – a threshold requirement for any claim filed in the Program – had not been demonstrated based on the record as it stands. *See* Rule 4(c) Report at 4-5, ECF No. 27. For the reasons discussed below, I find Petitioner did likely suffer residual effects of the alleged SIRVA for six months.

## I. Contemporaneous Medical Records

Petitioner received the subject Tdap vaccine in his left deltoid on May 30, 2023, during a routine physical with his primary care physician ("PCP"). Ex. 3 at 22-24.

The next day (May 31, 2023), Petitioner returned to his PCP complaining of "left arm pain – side effect from tetanus shot." Ex. 3 at 20. Petitioner noted his receipt of the subject Tdap vaccine the previous day, and explained that "[o]vernight he awoke to severe left shoulder pain rated at 9/10 in intensity." *Id.* Petitioner also complained that his range of motion ("ROM") was limited to the point that he was unable to put on deodorant, and was using a shoulder sling for comfort. *Id.*

Upon examination, Petitioner demonstrated tenderness at the superior aspect of the deltoid muscle and limited ROM "secondary to pain." Ex. 3 at 20. The PCP assessed Petitioner with acute pain of the left shoulder and an "adverse effect of tetanus vaccine[.]" *Id.* The treater noted that based on the location of Petitioner's pain, the physician was "worried the injection may have been given more superiorly causing local inflammatory changes[,]" and that Petitioner himself was concerned about having a SIRVA. *Id.* The PCP recommended that Petitioner rest his shoulder, use ice, take high-dose ibuprofen, and begin "gentle circular [ROM] exercises to avoid stiffness." *Id.* at 20-21. If the pain did not start to improve in one week, the PCP recommended re-evaluation. *Id.* at 21.

On June 8, 2023, Petitioner sought care with a sports medicine specialist for his left shoulder complaints.[3] Ex. 3 at 17. Petitioner reported "new problem of L [sic] superolateral shoulder pain onset 10 days ago." *Id.* He explained that last week he "went for his annual [physical] and received a tetanus shot; was feeling fine but developed severe pain later that night." *Id.* Petitioner stated that he had noticed "some incremental improvement" over the "last couple of days" with ice and ibuprofen, but his symptoms were "still limiting." *Id.* Petitioner explained that he had not been able to work (in construction) "since [the] pain started." *Id.* An examination of the left shoulder revealed diminished ROM and tenderness of the proximal deltoid. *Id.* at 18. The treater referred Petitioner to physical therapy ("PT") for "subacromial bursitis after immunization." *Id.*

---

[3] This treater also noted Petitioner's "several years" history of *right* shoulder and neck pain. Ex. 3 at 17. Petitioner reported that his "R [sic] shoulder pain has started to bother him again." *Id.* An examination of the right shoulder was normal. *Id.* at 18.

During a June 15th follow-up visit with the sports medicine specialist, Petitioner reported that his pain was "staying about the same." Ex. 3 at 10. He also reported that "yesterday [he] had a severe flare up after doing some yard work, rested it and woke up today feeling much better." *Id.* Although Petitioner reported being compliant with his home exercises, and thus this was "the best he felt since his initial injury[,]" Petitioner had ongoing pain with certain movements while awaiting PT. *See id.*

Petitioner had an initial PT evaluation on June 19, 2023. Ex. 4 at 2. He reported "left sided shoulder pain [that] started after getting tetanus shot on May 30th, achy/sore type pain that gets pretty significant with general use." *Id.* Petitioner described his "recent symptom trend" as "improving." *Id.* He also rated his pain ranging from a 3-7/10, and explained that it was aggravated by lifting items out to the side or overhead, dressing, and driving. *Id.* at 2-3. On examination, Petitioner exhibited decreased ROM. *Id.* at 3. The treater recommended eight weeks of PT treatment, and rated Petitioner's left upper extremity disability ("Quick DASH") score at a 45.45%.[4] *Id.* at 4.

Thereafter, Petitioner attended two additional PT visits (on June 22 and June 30, 2023). Ex. 4 at 5-6. During his June 22nd visit, he reported that his shoulder was "starting to feel a little better, but still feels like he is weak and wants to continue building up strength." *Id.* at 5. The treater noted that Petitioner had "minimal restriction in L [sic] shoulder ROM; but exhibits deficits in [upper extremity] strength and is currently only able to tolerate light weights/resistance w/ [sic] interventions." *Id.* The treater thus introduced resistance bands to Petitioner's PT regimen. *Id.*

At the third and final PT visit on June 30, 2023, Petitioner noted that his shoulder "felt fine after [the] last session, and his shoulder is feeling a lot better." Ex. 4 at 6. Under the assessment, the treater wrote that Petitioner "was introduced to sword pulls for improved rotator cuff strength[,]" which was "required for performing functional lifting/reaching tasks." *Id.* The treater noted the plan was for "rotator cuff strength." *Id.*

On August 4, 2023, Petitioner followed up with his sports medicine specialist. Ex. 3 at 10. Petitioner explained that "[s]ince the last [] visit . . . [he] was feeling good until [he] had a flare up in pain about [two] weeks ago after he was doing some drills and throwing the soccer ball, pain was still better than prior and has improved back to baseline." *Id.* at 10-11. Petitioner noted that he "[c]ontinues to experience pain with overhead activities." *Id.* at 11. He stated that he was compliant with his home exercises, "which helps." *Id.* On examination, Petitioner exhibited full but painful ROM. *Id.* The treater noted that "overall [Petitioner's] symptoms are improving; had a flare-up but has improved with home

[4] The treater noted that – consistent with DASH scores – a higher score reflects a higher level of disability. Ex. 4 at 4.

exercises[.]" *Id.* at 12. The treater recommended that Petitioner "continue with conservative management including home exercises from PT[,]" and the treater discussed with Petitioner "options for activity modifications." *Id.* If another flare up occurred, the treater instructed Petitioner to return sooner. *Id.*

Following an approximate seven-month gap in care for left shoulder symptoms, Petitioner returned to his sports medicine specialist on March 6, 2024. Ex. 5 at 2. The treater wrote that Petitioner was "returning for L [sic] shoulder pain. Since the initial injury in May after tetanus vaccine [Petitioner] notes 90% improvement in [symptoms] but pain has plateaued." *Id.* Petitioner reported that he "[c]ompleted PT in September[5] and kept up with home exercises but continues to note constant mild pain in the lateral shoulder." *Id.* He explained that he experiences stiffness in the mornings and that "flare ups occur[] less frequently and less severe but [his shoulder pain] has not fully resolved." *Id.* Petitioner also noted that his pain is exacerbated with driving, laying down, and working as a contractor, and he described his pain as "a nuisance." *Id.*

During the examination, Petitioner exhibited decreased ROM, and the treater thus recommended another course of PT. Ex. 5 at 3. The treater's plan included an assessment of "bursitis and rotator cuff tendinosis after tetanus immunization 5/2023." *Id.* The treater wrote that while Petitioner was "90% improved, [he] has residual constant nuisance pain, [and] would like to know if there is anything further that could be done to fully resolve or if this is the best it will get." *Id.*

Petitioner thereafter reinitiated PT on March 19, 2024. Ex. 4 at 7. He reported "L [sic] shoulder pain that occurred in May when he was . . . due for vaccine. The needle was put into the [rotator cuff and deltoid] area that provoked severe pain with difficulty using arm and working for first month." *Id.* The date of onset was listed as "last May 2023" with Petitioner's symptoms noted as "unchanged." *Id.* Petitioner explained that his prior participation in PT got him to a point where the symptoms were "manageable[;]" he endorsed a "90% improvement but [he] does have a lingering constant stabbing pain from the injection point." *Id.* Petitioner expressed concern that "[w]ith certain activities he doesn't feel like he can improve more than this 90%." *Id.* While he noted that he could work again as a contractor, holding his arm up with tension or weight "can provoke symptoms." *Id.* Petitioner expressed that he would like to get back to 100% if he could, and that he had ceased performing home PT exercises "since he stopped noticing the benefit." *Id.* He reiterated difficulties sleeping, dressing, and driving; and he rated his pain at a 0-5/10. *Id.*

---

[5] The records show that Petitioner's initial course of treatment with formal PT ended in June 2023. *See, e.g.*, Ex. 4 at 6.

Petitioner attended seven total additional PT sessions, through April 23, 2024. Ex. 4 at 7-23. During Petitioner's last visit on April 23rd, Petitioner noted that he was off from work the previous week, and upon his return, he experienced "a little pain[,]" which he was able to work out himself. *Id.* at 21. He continued to note ongoing pain with lifting, reaching across the chest, and carrying heavy items. *Id.* The treater noted that Petitioner "still presents with postural deficits, limited mobility, strength and endurance" that are impacting some functional abilities. *Id.* at 22. The treater recommended continued PT. *Id.* Petitioner did not attend any additional treatment thereafter, however, and no additional medical records have been filed.

## II. Declaration Evidence

In his declaration (authored in August 2024), Petitioner attests that "[o]n the date that [he] received the vaccination, May 30, 2023, [he] experienced severe debilitating pain in [his] left shoulder later in the evening." Ex. 1 ¶ 5. He described his course of treatment and noted that he was treated one day post vaccination "[d]ue to the continued pain in [his] left shoulder[.]" *Id.* ¶ 6. Petitioner explains that due to this ongoing pain, he thereafter "did home exercises . . . and was eventually referred for outside [PT]." *Id.* ¶ 7. He notes that PT "helped with [his] pain," but he "continued to have a lingering constant stabbing pain at the injection site." *Id.* ¶ 8. He attests that his PCP therefore recommended that he continue with PT, so he returned in March of 2024. *Id.* ¶ 9. Petitioner notes that he is no longer treating for his alleged SIRVA, "but [he] still feel[s] lingering effects from the SIRVA [], and [he does] home exercises." *Id.* ¶ 11. No additional witness declarations or affidavits have been filed.

## III. Applicable Legal Standard

Petitioners carry the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A). One such requirement is "documentation demonstrating that [the petitioner][6] . . . suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i); *see also Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

[6] Or other vaccinee, e.g., a minor or other person who is unable to represent his or her own interests, on behalf of whom the claim is brought.

The Act prohibits finding a petition requirement "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). This is because medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.* Patients may not report every ailment they are experiencing. *Id.*

Indeed, medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Rules afford the special master discretion in choosing whether to hold a hearing, stating that he or she "may decide a case on the basis of written filings without

an evidentiary hearing." *See* Vaccine Rule 8(d); *see also Kreizenbeck v. Sec'y of Health & Hum. Servs.,* 945 F.3d 1362 (Fed. Cir. 2020) (holding that the special master did not abuse his discretion by resolving the claim on the written record without the petitioners' consent).

**Analysis**

It is undisputed that Petitioner received the subject Tdap vaccine on May 30, 2023, and it is likely based on the existing record that the onset of his symptoms occurred within 48 hours of vaccination (at the latest). *See,* e.g., Rule 4(c) Report at 4-5 (not addressing whether the submitted evidence satisfies the QAI criteria). *Assuming arguendo* that the onset of Petitioner's injury occurred within two days of his receipt of the subject vaccination, he therefore must demonstrate by preponderant evidence that his residual symptoms continued for more than six months thereafter from onset, or through December 1, 2023 (again at the latest).

Despite the substantial gap in shoulder-related treatment in this case (from August 4, 2023, to March 6, 2024), I find that the severity requirement is met in Petitioner's favor (although the facts of this case strongly establish an extremely mild injury with minimal treatment).

Most persuasive is the fact that Petitioner's March 6, 2024 sports medicine specialist treatment records provide *some* evidence of continuing shoulder pain during the gap in treatment. Ex. 5 at 2. On that date, Petitioner "return[ed] for L [sic] shoulder pain" following an "initial injury in May after tetanus vaccine[.]" *See id.* He also noted that he had "kept up with home exercises but continue[d] to note constant mild pain[.]" *Id.* And, Petitioner described his injury consistent with his pre-gap medical records – that he experienced a "90% improvement in [symptoms] but [that his] pain has plateaued" or had otherwise not fully improved. *Compare id., with* Ex. 3 at 12 (stating on August 4, 2023 that "overall [Petitioner's] symptoms are improving; had a flare-up but has improved with home exercises[.]"). In addition, Petitioner reported similar limitations (i.e., with driving), as he did prior to the gap in care. *See* Ex. 4 at 2-3; *see also* Ex. 5 at 2. The fact that this entry appears in the *first* post-gap visit, and references the prior injury, corroborates severity allegations.

In addition, I balance the absence of record evidence showing shoulder treatment during the lengthy gap with the equivalent absence of evidence that the injury had likely fully resolved prior to the gap. *Compare* Ex. 3 at 10-12 (Petitioner's August 4, 2023 reports of "[c]ontinue[d] . . . pain with overhead activities" and the treater's recommendation for ongoing home exercises and options for activity modifications), *with* Ex. 5 at 2 (Petitioner's March 6, 2024 reports that he "kept up with home exercises but continues to

note constant mild pain in the lateral shoulder . . . [and his pain] has not fully resolved[,]" plus the treater's assessment of "bursitis and rotator cuff tendinosis after tetanus immunization 5/2023."). Such entries in the medical records, taken together, provide sufficient evidence of six-months sequelae – albeit barely.

More so, the fact that Petitioner's medical records do not contain *any* visits during the seven-month gap in care (for left shoulder complaints or otherwise), likewise provides some additional support for a favorable severity finding. Petitioner did not have occasions to mention left shoulder pain at other medical appointments. In addition, the mere fact that this case involves fairly limited treatment overall also is not an obstacle to a favorable severity finding. The Act does not require claimants to receive a particular level of treatment to establish temporal severity of an injury's residual effects. While the extent of treatment in any case bears on damages, a mild injury that otherwise meets the Table requirements and that "lasts" for the requisite six-month period is as compensable as a more severe injury.

Although I have found that Petitioner can meet the Act's threshold requirement, I note that to the extent Petitioner's injury continued after August 2023 and through the care gap, it can only be understood to have been *extremely mild* – with Petitioner reportedly being able to engage in yard work, throwing a soccer ball, and working in construction, all thus requiring the use of his left shoulder. Petitioner should thus not expect more than a nominal, modest award, even at full value of this case.

## Conclusion and Scheduling Order

Petitioner has presented sufficient proof to establish the six-month severity requirement. Section 11(c)(1)(D).

**Accordingly, by no later than Thursday, September 10, 2026**, the parties shall file a joint status report concerning the status of Petitioner's damages demand and, if appropriate, stating whether and when Respondent would like to file an amended Rule 4(c) Report.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master